SOPHIA DAVID, Administratrix of Estate of JAMES LEE DAVID, v. MIS-
SOURI PACIFIC RAILROAD COMPANY, Appellant.—41 S. W. (2d)
179.

Division One, July 28, 1931.

438

*Edw. J. White* and *Hackney & Welch* for appellant.

*Edmund H. McVey, Samuel R. Freet* and *Lester G. Seacat* for respondent.

440

RAGLAND, J.—This case comes to the writer on reassignment, having originally been assigned to one of our commissioners for the preparation of an opinion. It is an action under the Federal Employer's Liability Act to recover damages for the death of James Lee David, alleged to have been caused by the negligence of the defendant. David was in the employ of defendant as a train rider. Whilst engaged in the discharge of the duties incident to his employment, in the early morning of May 17, 1923, he was shot and killed by one Bert Gladsen, a train robber, who had gone to the place where the train under David's protection was standing for the purpose of breaking into and stealing from the box cars. The trial in the circuit court resulted in a verdict for plaintiff for $15,-000. The cause comes to this court on defendant's appeal.

"It was admitted that David, when killed, was in the line of his duty, that his work was interstate commerce, and no question was raised as to the plaintiff being the administratrix of his estate. The sole question presented in the trial court and pressed here is whether or not any negligence of the defendant was shown and if so, whether it was the proximate cause of David's death." [Appellant's brief.]

The statement of the facts will be limited accordingly.

In April, 1923, the appellant was being "harrassed, annoyed and robbed" by an organized gang of thieves, in and adjacent to Kansas City; it was being "robbed" every week around Kansas City; robberies had occurred at Leavenworth, Atchison, Stillwell, Osawatomie and Paola, in Kansas, and at Pleasant Hill and Raytown, in Missouri. The thieves, who were reported to be "bad men" who would shoot their way out of trouble when confronted with it, specialized in looting box cars carrying certain kinds of merchandise. Their depredations were not confined to any particular trains or runs, nor would they occur every night; they happened sporadically, yet frequently, at some point in the territory just referred to.

David was employed as a train rider on or about April 1, 1923. As such he was under the immediate supervision of appellant's divisional special agent at Kansas City by whom he was assigned to trains as and where needed. It was his duty to examine the seals of the car doors and see that they were intact and that the train was all right, both before departure and en route. In a general way he was to protect the train. There was no fixed rule about where he should ride on a train. He could ride in the caboose, in the engine cab or in a box car, as his judgment might dictate. With respect to the information and instructions given him at the time of his employment appellant's then special agent, C. M. Barber, testified:

"I told him that we were having a great deal of trouble with a bad gang of train robbers robbing our trains en route and that I was looking for a man of sufficient ability to cope with them—a man who was not afraid to cope with them and a man who would shoot and use good judgment and watch things and if possible catch them, and after I had gone over the matter thoroughly with him he said, 'I will take the job' or words to that effect. . . . I explained to him that they had been robbing the cars en route—throwing the stuff out en route and they were a large gang and a bad gang. . . . I told him that all of them were armed and that all of them would shoot him on sight and that he had to be very careful.

"Q. To be careful about what? A. About his own life."

David was given a pistol and a sawed-off shot gun for the purpose of defending himself and the company's property. He was also given a flashlight. With respect to its use Mr. Barber testified:

"Well, the use of a flashlight in that business is very little, but occasionally it is very necessary. It is not necessary to examine the seals. They generally use them in order to protect their persons from hiding bandits along between the cars, but there are cases where you might find a door open and want to flash the light inside of a dark car to see what was the condition in it."

Prior to his employment as a train rider David had had some experience in police work of a special character. In 1907 he had served as a guard to protect the property of a coal company during a strike by its employees. From 1911 to 1915 he worked for the Pinkerton Detective Agency, in Kansas City; "he walked a beat for them . . . a guard sort of . . . he was armed."

At the times first mentioned appellant maintained a departmental organization for special service. The special service performed by it was essentially police work, having for its objective the protection of both the property of the railroad and that entrusted to it for transportation. The head of the special service organization, styled Chief Special Agent, was R. S. Mitchell. Mr. Mitchell's headquarters were

in St. Louis. An assistant chief special agent, W. H. Boult, maintained headquarters in Kansas City.

About the time David entered appellant's employ one McCarthy was also employed for the special service. McCarthy was a member of the gang of thieves against whose depredations the appellant was making strenuous efforts to protect itself. With respect to the nature and terms of the employment Mr. Mitchell testified:

"I talked with McCarthy probably two or three hours (at the Baltimore Hotel in Kansas City), at which time he told me the history of the robberies committed by this gang; he told me at that time who was acting as head of the gang, who was furnishing the brains for these thieves, and he told me a great many details in connection with these robberies; he told me that he was trailing with the gang and he wanted to get away from them. I arranged with him to keep us informed as to the activities of this gang, to give us advance information, if possible, when this gang planned to rob our trains, and further arranged with him, in the event he could not get to us, couldn't give us advance information, to give us information then as to the fence where the stuff was taken, as well as who was in the robbery, and all the details possible. Now, after I had satisfied myself that McCarthy knew what he was talking about, and I believed he could do what he contracted to do, I arranged with him to pay him one hundred and fifty dollars a month for that sort of service, and then I called in my assistant, Mr. W. H. Boult, and I introduced Boult to McCarthy, and arranged with McCarthy his way of reporting to Mr. Boult, and left the matter in Mr. Boult's hands. . . .

"He reported to Mr. Boult by 'phone; that was the arrangement made at that time, and if it was necessary to arrange a meeting, he was to arrange a meeting by 'phone.

"Q. He knew how to get hold of Mr. Boult? A. Yes, night and day service.

"Q. And where he could reach Mr. Boult at any time if he might want him? A. Yes, sir."

It was understood, however, that McCarthy was not to report an intended robbery unless he could do so without uncovering himself to the gang.

Following his employment McCarthy reported to Boult from time to time the plans and doings of the gang. On one occasion he reported that they intended robbing a train at Kenneth Tank, in Kansas (twenty-five miles out from Kansas City). He made the report about five o'clock in the afternoon; the robbery was to take place that night. Thereupon a warning was sent out to the riders and the crew of the train, and an automobile load of special officers, with the aid of the local police, covered the place of the intended

robbery during the night. The plans of the robbers miscarried, however, and they never left Kansas City, Kansas.

On May 16, 1923, one of the gang was on trial for robbery in the district court in Kansas City, Kansas. A number of his associates, including McCarthy, were in attendance as spectators. They were in and around the court room throughout the day. At the noon hour one of them suggested that they rob a merchandise train of defendant when it reached Leavenworth that night—the train was due there at about 1:30 in the morning. The matter was discussed by them at intervals during the afternoon, they finally agreeing to get together that evening at the house of one Riley. They met at Riley's at about 6:30 P. M. After further discussion there of the plan which had been taking form during the afternoon it was definitely agreed upon, although some of them declined to participate; having robbed this particular train at the same place several times before they were of the opinion that it was too "hot."

Pursuant to the plan just mentioned, four of the gang, Bert Gladsen, Red Loar, Lawrence Hayes and McCarthy, left Kansas City at ten o'clock that night for Leavenworth. They left in an automobile and reached Leavenworth about 11:15. They stopped at an old sugar refinery about a half block from the Missouri Pacific tracks and waited for the train—about an hour or an hour and a half.

On arriving at south Leavenworth the train took a siding to clear the main track for a passenger train and stopped.

When the train whistled at Leavenworth, Gladsen and McCarthy got out of the waiting automobile, and Loar and Hayes drove away. It was the plan that the former would break into the cars at south Leavenworth, get the merchandise ready and throw it out at a particular crossing previously agreed upon, in the north end of the town, where the other two with the car would meet them and return with the loot to Kansas City.

On leaving the automobile Gladsen and McCarthy went over to the railroad tracks, climbed up on the train and rode down into the yards to the place where it stopped. They were both armed and McCarthy had a pinch-bar, the breaking tool.

After the train had been standing probably ten minutes Dougherty the conductor, and Boyd, also a train rider, left the caboose and proceeded forward between the main line and the passing track. Boyd was behind Dougherty. When they reached a point twenty-five or thirty car-lengths from the engine, they heard two shots, fired close together; the place of the shooting was four or five car-lengths ahead of where they were. Dougherty proceeded ahead and found David lying on the ground dead. He testified: "It appeared that he was shot (in the chest somewhere) from someone standing up and

ranged downward.'' David fell between twenty and twenty-five car-lengths, from the engine, where he had been when the train stopped, and on the same side of the train where Dougherty and Boyd were walking. Dougherty did not see David when he was shot; he did not see the person who did the shooting; he saw no gun flashes; he neither saw nor heard anything to indicate the presence of box-car thieves prior to the firing of the two shots. David was armed with a revolver and a sawed-off shot gun at the time.

Gladsen was subsequently convicted of the murder of David and sentenced to life imprisonment.

McCarthy did not give to Boult or to any other officer or agent of appellant advance information of the contemplated robbery. He made no report of any kind with respect thereto until seven or eight o'clock in the morning following the occurrence in which David was killed. He then gave Boult ''all the information on who killed David and how it happened.'' As a result of McCarthy's failure to inform Boult of the intended robbery neither the train riders, David and Boyd, nor the members of the train crew, were given any warning thereof.

Appellant contends that McCarthy had no opportunity for communicating with Boult over the telephone prior to the happening of the event without uncovering himself as an informer. The evidence, however, abundantly justifies a finding to the contrary. It shows that for reasons of his own McCarthy absented himself from the members of the gang for a brief interval two or three times during the evening prior to the departure for Leavenworth. It further shows that there were many other occasions during the same period when, on one pretext or another, he could have left them for a sufficient length of time to have gotten into communication with Boult's office —unless he was under suspicion, and that is not remotely suggested by the record.

McCarthy's employment was kept a secret; only the heads of the special service department were supposed to know it. Presumably David had at no time any knowledge of the company's efforts to secure advance information of intended robberies.

The cause was submitted to the jury on the following assignment of negligence: ''that said defendant through its agents and employees knew of said contemplated robbery in time, by the exercise of ordinary care, . . . to have warned said James Lee David of said proposed robbery so that said James Lee David could have protected himself, but said defendant negligently and carelessly failed so to do, and as a result thereof said James Lee David was shot and killed as aforesaid.''

I. It is contended by appellant that, even though it had advance information that a gang of armed thieves and robbers were intending to loot one of its trains at south Leavenworth in the early morning of May 17, and, therefore, knew the specific perils that would be encountered at said time and place by its train rider, David, it was under no duty to impart such information to him, and for that reason it was not negligent in failing to do so. The contention is stated at length by counsel as follows:

"The deceased, James Lee David, having been employed by the defendant for the express purpose of protecting defendant's trains from car thieves and train robbers, and having been fully warned that robberies of such trains as he was guarding and riding were likely to occur at any time and place, and that the car thieves were desperate characters who were likely to take his life in attempts to frustrate such robberies and in the protection of said property by him, and having been fully instructed to arm himself, as he did arm himself, with a loaded revolver and loaded sawed-off shot gun; and said David having accepted employment with knowledge of such probable activities of said train robbers and of the dangers to himself in coping with them, he voluntarily assumed the risks of such employment, and the shooting of David by Gladsen was incident to David's service and was one of the risks assumed by him. This was one of the risks and perils ordinarily incident to his employment. . . . No duty, therefore, rested on his employer to obtain and give David notice of this particular intended train robbery."

The facts of this case, as the basis of an action for personal injury or death, are unusual. The question of whether they constitute a sufficient predicate for the charge of negligence may, nevertheless, be resolved upon principles which are familiar. Assumption of risk arises out of the contract of employment, the obligations of which are mutual. The servant on the one hand impliedly agrees to assume the risk of all dangers and perils ordinarily incident to the work undertaken by him; the master on the other hand impliedly contracts that he will at all times do whatever may be needful to minimize or obviate such risks, in so far as the same may be done by the exercise of ordinary care. It is axiomatic that, prima-facie, a servant does not assume any risks which may be obviated by the exercise of reasonable care on the master's part. [3 Labatt's Master & Servant (2 Ed.) sec. 894.]

"One, and perhaps the most important, of those exceptions (to the doctrine of assumption of risk), arises from the obligation of the master, whether a natural person or a corporate body, not to expose the servant, when conducting the master's business, to perils

or hazards against which he may be guarded by proper diligence upon the part of the master. To that end the master is bound to observe all the care which prudence and the exigencies of the situation require . . ." [Hough v. Railroad, 100 U. S. 213, 217.]

"It is those risks alone which can not be obviated by the adoption of reasonable measures of precaution by the master, that the servant assumes." [Pantzar v. Mining Co., 99 N. Y. 368, 376. See also Labatt, supra, sec. 1178 and cases cited in the notes.]

Although David knew, appreciated and assumed the dangers incident to his employment, it was, notwithstanding, the continuing duty of his employer to exercise ordinary care to minimize or obviate them. That a timely warning to David, giving him the information which appellant had acquired in advance of the intended robbery, subsequently attempted, would have greatly minimized, if not obviated, its perils to him, is so obvious as to require no elaboration. In its failure to give such warning, appellant was derelict in the discharge of a duty both moral and legal.

If the jury's finding in this case is warranted by the evidence, appellant's negligence, and not the assumed risks incident to his employment, was juridically speaking the proximate cause of David's death.

II. Appellant's next contention is that, even though its failure to warn David be deemed negligence, the evidence was not sufficient to justify a finding that such negligence proximately caused his death. This causal connection, it is true, must be proved by the evidence, as a fact, and not be left to mere speculation and conjecture. The rule, however, does not require that there must be direct proof of the fact itself. This would often be impossible. It is sufficient if the facts proved are of such a nature, and are so connected and related to each other, that the conclusion therefrom may be fairly inferred. [Settle v. Railroad, 127 Mo. 336, 341, 30 S. W. 125.]

The evidence is lacking somewhat in detail as to the shooting of David. Only two persons, perhaps, could have circumstantially described the occurrence: McCarthy, whose whereabouts at the time of the trial were apparently unknown, and Gladsen, who was serving a life sentence for the murder in the Kansas penitentiary at Lansing. The latter's deposition was taken and read in evidence, but he was not interrogated as to the fatal shooting. Notwithstanding, there are sufficient facts in evidence to induce the belief that David unsuspectingly walked into a veritable death trap.

When the train came to a stop in the yards at south Leavenworth, David presumably left the cab of the engine where he had been riding and started walking toward the rear of the train, examining

the seals on the box cars as he went. The flashlight which he carried was not necessary for that purpose and was not used by him. When he had gotten a distance of twenty or twenty-five car-lengths from the engine, two shots, fired in close succession, suddenly rang out, and he fell to the ground alongside the train, dying instantly. Dougherty, the conductor, who had left the caboose and was walking forward on the same side of the train, neither saw nor heard anything that attracted his attention until the two shots were fired; at that time he was but four or five car-lengths from where David fell; he did not see David when he was shot; he did not see any one do the shooting; he saw no flash from the firearm; and he saw no one running away from the scene of the shooting. Manifestly, the assassin was hiding between the cars, he fired at David the moment he came in range and then made his escape from the opposite side of the train. Whether Gladsen, who was there for the purpose of breaking into the box cars and stealing the contents, was impelled by fear of detection to shoot David, or otherwise, is a matter of conjecture. Notwithstanding, the outward setting is perfectly plain: David unwittingly walked into deadly peril and thereby lost his life.

Appellant argues that as David had been warned specifically and fully with regard to the activities of the gang of thieves, of their dangerous character and of the likelihood of their attempting to shoot and kill him in case he came in contact with them, it cannot be reasonably inferred that he would have been any more alert or would have taken any greater precaution for his own safety, on the occasion of the attempted robbery at Leavenworth, had he been forewarned with respect to it. The argument overlooks the fact that the dangers generally incident to David's work, like those of any policeman who walks a beat at night, were merely contingent and in a sense remote. Foreknowledge that a specific danger will arise at a definite time and place will bring about quite a different reaction on the part of a policeman or any other. In addition to quickening the perception of the danger, such knowledge makes possible the adoption of adequate measures to meet or avoid it. From the characteristics of the thieves and their methods of operating, it is quite clear that they never courted an open battle with train guards: they merely shot their way out of trouble. If David had known of their presence when he left the engine cab, he would also have known that it was not only possible, but highly probable, that some of them were lurking between the box cars. With that knowledge it is inconceivable that he would have exposed himself to the particular peril which cost him his life. To say that he might have been killed anyway, even if he had been forewarned that the thieves would be there and had consequently followed a different course for the pur-

448

pose of warding them off and protecting the company's property, is to leave the evidence for an excursion into the field of conjecture. From the evidence it may be justly inferred that David's death resulted from appellant's failure to warn.

What has been said disposes of all the questions raised and presented for determination. The judgment of the circuit court is affirmed. All concur.